**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DR. DAVID S. ZIELINSKI, <br><br> Plaintiffs, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE and DR. LEE NADLER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 24-10667-MJJ

**MEMORANDUM OF DECISION**

June 23, 2026

JOUN, D.J.

The United States of America and Dr. David Zielinski ("Relator") bring this action against Defendants President and Fellows of Harvard College ("Harvard" or "Harvard University") and Dr. Lee Nadler ("Defendants") for violations of the False Claims Act, 31 U.S.C. § 3730, *et seq.* Relator alleges that, for more than a decade, Defendants received over a quarter of a billion dollars in grant funding from the National Institutes of Health ("NIH") based on false statements in Defendants' grant applications and subsequent progress reports. [Doc. No. 1]. Specifically, Relator alleges that despite Defendants' representations that they would use the grant funding to conduct certain projects, Defendants never intended to—and in fact did not—perform that work. Before me is Defendants' Motion to Dismiss for failure to state a claim. [Doc. No. 38]. For the reasons

explained below, Defendants' Motion to Dismiss, [Doc. No. 38], is <u>GRANTED in part</u> and <u>DENIED in part</u>. The Motion is <u>DENIED</u> as to Counts I and II but <u>GRANTED</u> as to Count III.

## I.    LEGAL AND REGULATORY BACKGROUND

### A.    <u>The False Claims Act</u>

The False Claims Act (the "FCA") creates liability to the United States for an individual or entity who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" "conspires to commit a violation of" the FCA, or; "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G). A person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of damages sustained by the United States. *Id.* at § 3729(a)(1).

Under the FCA, a person "knows" a claim is false if that person, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). Additionally, the FCA does not require proof that a defendant specifically intended to commit fraud. *Id.* at § 3729(b)(1)(B). The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property." *Id.* at § 3729(b)(2)(A).

A claim can be "presented to an officer, employee, or agent of the United States" or "to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the

Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* at § 3729(b)(2)(A)(i), (ii).

The term "obligation" under the FCA means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* at § 3729(b)(3).

The term "material" under the FCA means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

**B.      Federal Law Governing Grants**

The federal government awards billions of dollars in grant funding to numerous entities each year; in Fiscal Year 2022, NIH awarded over $33.3 billion in research grants to recipient organizations. [Doc. No. 2 at ¶22]. The government has established regulations setting forth uniform administrative requirements for federal awards to grant recipients. [*Id.* at ¶ 23 (citing 45 C.F.R. Part 75)]. These regulations require that the U.S. Department of Health and Human Services ("HHS") incorporate as terms and conditions of any applicable federal award, the administrative requirements imposed by the regulations, national policy requirements, and integrity and performance matters. [*Id.* at ¶ 24 (citing 45 C.F.R. § 75.210(b))]. The awarding agency must communicate to the grantee "all relevant public policy requirements" and "incorporate them either directly or by reference in the terms and conditions of the Federal award." [*Id.* at ¶ 25 (citing 45 C.F.R. § 75.300(a))]. Pursuant to these regulations, the NIH has promulgated the "*NIH Grants Policy Statement*" as the authoritative publication detailing the policy requirements that also serve

as the terms and conditions of NIH grant awards. [*Id.* at ¶ 25]. Grantees are responsible for complying with all requirements of the federal award, 45 C.F.R. § 75.300(b), and are required to make specific certifications and assurances to the issuing agency (HHS), operating division (NIH) and the program office (NIH National Center for Advancing Translational Science). [*Id.* at ¶ 26]. These certifications include the Application Guides relevant to a given award. [*Id.*].

The Application Guides require that the applicant organization secure and retain a written assurance from the principal investigator ("PI") of the study, and this assurance must be made available to the sponsoring agency upon request and needs to contain, at a minimum, certifications by the applicant organization that it is responsible for verifying its eligibility and the accuracy, validity, and conformity with the guidelines. [*Id.* at ¶ 27]. The applicant organization must also certify that it will be accountable for the appropriate use of funds awarded, that deliberate withholding, falsification, or misrepresentation could result in criminal or civil penalties, and that the grantee institution may be liable for reimbursement of funds associated with any inappropriate or fraudulent conduct of the project activity. [*Id.*]. The Application Guides make clear that by virtue of signing the face page of the grant application, the grantee certifies its compliance with its obligation to abide by the *NIH Grants Policy Statement*. [*Id.* ¶ at 28]. The *NIH Grants Policy Statement* also explains that by drawing funds from the HHS payment system, the recipient agrees to the terms and conditions of the award. [*Id.* at ¶ 29]. Two relevant areas of compliance with respect to federal grants are the "Administrative Requirements" and "Audit Requirements." [*Id.* at ¶ 30]. The *NIH Grants Policy Statement* incorporates by reference specific Code of Federal Regulations provisions that apply to each of these compliance areas, and the grantee and PI are required to strictly abide by these terms and conditions. [*Id.*].

### 1.    Scope Modifications and Prior Approval

A grantee is required to submit a detailed description of the proposed work and related budget for review and approval as part of its application. [*Id.* at ¶ 32 (citing 45 C.F.R. § 75.308(a))]. Using the submitted budget, the NIH issues the Notice of Award ("NoA") which sets forth the total award and breaks down the available funds for each distinct budget category. [*Id.*]. A fundamental requirement of any NIH grant is that the recipient conduct its project in accordance with the approved application and budget and terms and conditions of the award. [*Id.* at ¶¶ 33–34]. A "change in scope" of the grant—defined as a change in the direction, aims, objectives, or purposes of the approved project—will always require prior NIH approval. [*Id.* at ¶ 35]. The applicable federal regulations also impose similar requirements. [*Id.* at ¶ 36 (citing 45 C.F.R. § 75.308(b), (c)(1)(i))].

### 2.    Progress Reporting

Governing regulations require the grantee to oversee and monitor compliance with the federal requirements of the award. [*Id.* at ¶ 38 (citing 45 C.F.R. § 75.342(a))]. The HHS awarding agency is obligated to collect performance information via the Research Performance Progress Reporting ("RPPR") process. [*Id.*]. The grantee must submit performance reports as often as the awarding agency requires, but at minimum, a grantee must submit an RPPR annually and at the end of the award period. [*Id.*]. The RPPRs document the grant recipient's accomplishments and compliance with the terms of the award and play a vital role in effective monitoring of grantees' use of federal funds and in ensuring compliance with applicable Federal requirements and performance expectations. [*Id.* at ¶ 39].

Annual RPPRs are used to describe a grant's scientific progress, identify significant changes, report on personnel, and describe plans for the subsequent budget period or year. [*Id.* at

¶ 40]. Final RPPRs are used as part of the grant closeout process to submit project outcomes in addition to the information submitted on the annual RPPR, except budget and plans for the upcoming year. [*Id.* at ¶ 41]. RPPRs are submitted by the PI online. [*Id.* at ¶ 42]. The PI must state which of the stated goals have not been met and must also certify that the awardee organization is in compliance with the terms and conditions of the award and that the information in the RPPR is accurate. [*Id.* at ¶¶ 43–44].

## II.    FACT BACKGROUND

### A.    <u>The Parties</u>

Plaintiff is the United States of America (the "Government") and is the real party in interest with respect to the Federal False Claims Act *qui tam* claims made herein pursuant to 31 U.S.C. § 3730(b). [Doc. No. 2 at ¶ 12]. Plaintiff-Relator (the "Relator") Dr. David S. Zielinski is the executive director of the Harvard Clinical and Translational Science Center ("Harvard Catalyst" or "the center") and associate dean for clinical and translational research at Harvard Medical School. [*Id.* at ¶ 13]. Dr. Zielinski worked at the National Institutes of Health ("NIH") for nearly a decade, leading offices focused on science policy and communications. [*Id.*]. At the NIH, Dr. Zielinski was trained in grant administration and, for a period, managed a portfolio of NIH grants. [*Id.*].

Defendant President and Fellows of Harvard College ("Harvard University") is a non-profit corporation that included Harvard Catalyst as a shared enterprise of Harvard University; Harvard Catalyst is not a separate legal entity. [*Id.* at ¶ 14]. The center works across the university and affiliate academic healthcare centers to provide training, support, funding, and opportunities for collaboration among clinical and translational researchers. [*Id.* at ¶ 14(a)]. Harvard Catalyst was founded in 2008 by Defendant Dr. Lee Nadler, MD ("Dr. Nadler" or "Defendant"). [*Id.* at ¶¶ 14(a),

15]. Dr. Nadler continues to serve as principal investigator ("PI") at Harvard Catalyst and simultaneously holds other research and academic roles at the university, including dean for clinical and translational research at Harvard Medical School, the Virginia and D.K. Ludwig Professor for Cancer Research and Training, and senior vice president for academic integration and the Pan Mass Challenge Senior Investigator at the Dana-Farber Cancer Institute. [*Id.* at ¶¶ 14(a), 15]. Harvard Medical School is a graduate Medical School of Harvard University that is affiliated with several teaching hospitals and research institutes in the Boston area; it is not a separate legal entity from Harvard University. [*Id.* at ¶ 14(b)].

### B.     **Translational Sciences and the CTSA Grants Program**

Translation is the process of turning observations in the laboratory, clinic, and community into interventions that improve the health of individuals and the public, such as diagnostics, therapeutics, medical procedures, and behavioral changes. [*Id.* at ¶ 47]. Translational science is the field that generates scientific and operational innovations that overcome longstanding challenges as scientific observations are developed into diagnostics and therapies. [*Id.*]. The NIH National Center for Advancing Translational Sciences ("NCATS") conducts and supports research in the science of translation to create innovative methods and technologies to speed the development, testing, and implementation of diagnostics and therapeutics across a wide range of human diseases and conditions. [*Id.* at ¶ 48].

NCATS also administers the Clinical and Translational Science Awards ("CTSA") Program, which provides funding to a national network of medical institutions that drives the translation of research discoveries into improved care. [*Id.* at ¶ 49]. The CTSA program is one of the largest grant programs within NIH. [*Id.*]. The CTSA program funds several different activities; the most relevant here are the CTSA Program Hubs. [*Id.* at ¶ 50]. A CTSA Hub is an integrated

research and training environment that catalyzes the development, demonstration, and dissemination of methods and technologies that improve the efficiency and quality of translational science. [*Id.* at ¶ 51]. Medical research institutions and academic health centers that make up the CTSA Program are referred to as "hubs" to indicate their role in their local medical communities, where they coordinate and collaborate with affiliated hospitals, clinics, and community health centers. [*Id.*]. Hubs are expected to have foundational capabilities to both serve as field-leading centers for clinical translational science innovation locally, and as participants in multi-Hub collaboratives regionally and nationally. [*Id.*].

A CTSA Hub grant includes a "U" award. [*Id.* at ¶ 52]. The "U" denotes a research project with complex structure and linked training and research grants. [*Id.*]. Each CTSA Hub application is structured around several key areas, referred to as "elements," each of which is addressed by the applicant in one or more proposed modules. [*Id.* at ¶ 53]. CTSA Program Hub grants are awarded based upon applications covering up to seven-year time spans. [*Id.* at ¶ 54]. When multiple years are awarded, NIH awards each year's funding with a separate Notice of Award ("NoA") covering that year. [*Id.*]. Each NoA reiterates the relevant NIH terms and conditions. [*Id.*].

### C.    **Harvard Catalyst**

Harvard Catalyst was founded in 2008 by Defendant Nadler. [*Id.* at ¶ 55]. According to the Complaint, Dr. Nadler joined Harvard in the summer of 2007 when Harvard was at risk of losing out on a major NIH grant. [*Id.* at ¶ 56]. When Nadler joined, he "pushed out some people who were working on the grant and brought in his own team to staff," ultimately emerging with Harvard Catalyst's first CTSA Hub grant of $117.5 million. [*Id.*]. Since its founding, Harvard Catalyst has received over a quarter billion dollars in funding from the NIH, primarily through a series of five-year CTSA Hub grants. [*Id.* at ¶ 57]. From 2008 to 2013, Harvard Catalyst received $117.5 million;

from 2013 to 2018, Harvard Catalyst received $106 million, and; from 2018 to 2023, Harvard Catalyst received approximately $93 million. [*Id.*]. At the time of the complaint's filing in March 2024, the center's U award was recently re-funded, meaning that Harvard would likely receive more than $76 million for a new seven-year cycle running from 2023 to 2030. [*Id.*].

Relator joined Harvard Catalyst in 2018 as its executive director, responsible for Harvard Catalyst's operations and reported directly to Defendant Nadler to implement Dr. Nadler's priorities and vision. [*Id.* at ¶ 59]. Relator is a former NIH official with experience overseeing federal grants. [*Id.* at ¶ 63]. Relator alleges that Dr. Nadler has nearly complete control over Harvard Catalyst, including its CTSA grant applications and certifications. [*Id.* at ¶ 59]. Relator commenced his tenure at Harvard Catalyst just as the 2018 to 2023 CTSA award was beginning. [*Id.* at ¶ 60]. Relator alleges that during his tenure, Relator began to understand that Dr. Nadler consistently disregarded the terms and conditions of the NIH grants the center received. [*Id.* at ¶ 61]. Relator discovered that Dr. Nadler consistently refused to conduct Harvard Catalyst's federally funded activities in accordance with the approved budget and application, as required. [*Id.*]. Relator is aware of multiple instances in which Dr. Nadler told Relator and other colleagues that Dr. Nadler writes to the grant's funding opportunity announcement to get funded and then decides what to do with the money. [*Id.* at ¶ 62].

Within months of assuming the executive director role in 2018, Relator warned Dr. Nadler that Harvard Catalyst was legally obligated to conduct its NIH-funded work in accordance with the approved application and budget, and that substantially deviating without approval constituted grant fraud. [*Id.* at ¶ 63]. However, Dr. Nadler responded that Relator "didn't understand grantsmanship," that "this is what everyone does," and that this is how Dr. Nadler has handled grants for decades. [*Id.*]. During Relator's tenure with Harvard Catalyst, he witnessed repeated

9

instances in which Defendants obtained millions of dollars based on specific representations that Defendants did not feel obligated to comply with. [*Id.* at ¶ 64]. Once Harvard Catalyst and Dr. Nadler received grant funding, they frequently made no effort to perform the work they certified they would conduct. [*Id.*]. Defendants also did not seek approval to change the scope of the grant to reflect the work they did intend to do. [*Id.*]. When Defendants completed the annual and final RPPRs, they falsely stated that they had complied with the terms and conditions of award. [*Id.*].

### 1.  CTSA Hub Grant 2018–2023 (the "2018 Grant")

Harvard Catalyst's 2018-2013 Program Hub award was funded by the NIH under Funding Opportunity Announcement ("FOA") Number PAR-15-304. [*Id.* at ¶ 65]. The FOA sought an application for a "U" Hub grant along with linked "K" for institutional career development and "T" for training grants. [*Id.*]. This FOA noted that applicants must follow the instructions in the application guide, and that all NIH awards are subject to the terms and considerations described in the NIH Grants Policy Statement. [*Id.* at ¶¶ 66–67]. The application for this award, signed by Defendant Nadler, runs over 2,450 pages, contains detailed descriptions of proposed projects and related budgets outlining the expenditures of over $90 million, and outlines 56 specific aims across eleven areas—nine "core" areas and two additional core areas addressed to the K and T grants. [*Id.* at ¶ 68].

In response to the application, NIH awarded Harvard Catalyst five years of grants under Federal Award Identifier ("FAIN") UL1TR002541 starting in May 2018. [*Id.* at ¶ 69]. Each year between 2018 and 2022, NIH issued a Notice of Award ("NoA") for that year's budget allocation bearing a grant number UL1TR002541, followed by a sequential number reflecting which year the budget represented, i.e., in 2018, Defendants were awarded grant number UL1TR002541-01. [*Id.* at ¶ 70]. Each of the NoAs identifies the "terms and conditions" which expressly incorporate the

terms and conditions of 45 C.F.R. Part 75, the requirements in the NIH Grants Policy Statement, and the reporting requirements of the RPPR. [*Id.* at ¶ 71]. Each NoA also contains "Specific Award Conditions" which among other requirements, reference conditions for "prior approval requests." [*Id.* at ¶ 72]. As part of these requirements, the NoAs further advise Defendants to refer to the NIH Grants Policy Statement for the activities and expenditures that require NIH approval. [*Id.* at ¶ 72].

In 2023, Relator participated in preparing the final RPPR close-out report for the 2018–2023 grant period. [*Id.* at ¶ 73]. Relator saw that of the 56 aims identified in the application, the center failed to complete 41 aims, about two-thirds of the project, in accordance with the approved budget or plans. [*Id.*]. Of the 41 incomplete aims, Defendants did not conduct any work on 21 of those aims. [*Id.*]. Below is a list of specific examples of aims that were incomplete, according to the complaint:

- **Core B: Informatics—computer systems and platforms designed to support or improve the conduct of research**. The grant application proposed a budget of $15,788,204 to accomplish five specific "informatics aims." The application identifies numerous individuals who will be devoted to those aims and their respective roles in furthering those aims. Plaintiff alleges that none of the new platforms were developed, despite the Center having received federal funds for that purpose. Rather, NIH funds were used to fund informatics researchers and staff, but it is not clear what those individuals worked on and/or how they spent their time. Plaintiffs allege that it is clear that the specific aims that Defendants submitted to NIH, and later certified adherence to, were not completed or often not started. [*Id.* at ¶¶ 74–77].

- **Core C: Community and Collaboration—to create and sustain interdisciplinary, inter-professional partnerships in support of CT research.** The grant application proposed a budget of $3,053,773 to accomplish seven specific aims. Defendants failed to use the funds obtained to foster these projects. Specifically, Plaintiff alleges that shortly after receiving the grant award, Dr. Nadler fired the Community and Collaboration Core faculty leads and replaced them with Dr. Karen Emmons. Dr. Nadler allowed Dr. Emmons to disregard the aims identified in the grant application, so she did not pursue any of the seven aims upon which the award was based. Rather, she spent the NIH funds on different projects that met her personal research interests. For example, Dr. Emmons deployed the NIH funding to develop Harvard Catalyst's Community Coalition for Equity in Research, expanded consultations for investigators, and created a health policy atlas. None of these projects were within the initial grant application or presented to the NIH for approval. [*Id.* at ¶¶ 78–80].

- **Hub Research Capacity Core F: Participant and Clinical Interactions Program Aim 2— create, continuously evaluate, expand, and improve the Harvard Catalyst Integrated Resources Platform ("HC IRP").** The application stated that this HC IRP would support CT investigators and their teams, but it was never created. Plaintiff alleges that the concept described in the application with respect to the HC IRP was identical to the "Locator" program funded in the prior 2013 grant cycle, which was never produced. Harvard Catalyst proposed nearly the same concept in the 2023 grant cycle, again named "Locator." [*Id.* at ¶ 82].

On the final RPPRs, question B2 asks the PI, "What was accomplished under these goals," and reminds the PI that "goals are equivalent to specific aims." [*Id.* at ¶ 83]. To avoid scrutiny by the NIH, Relator alleges that Dr. Nadler identified "enhancements" made to certain projects, but did not address unmet goals—for instance, he did not address that the HC Informatics Toolkit was never developed as proposed, the p2i project that never developed as proposed, or that the new functionalities to the Profiles platform were never developed as proposed. [*Id.* at ¶¶ 84–85]. Additionally, Defendants identified accomplishments made for the Community and Collaboration core but ignored that they did not pursue the IEP program as proposed as the central piece of this core in the grant application. [*Id.* at ¶ 87].

### 2.    CTSA Hub Grant 2013–2018 (the "2013 Grant")

Harvard Catalyst's 2013–2018 Program Hub award was funded by the NIH under FOA Number RFA-TR-12-006. [*Id.* at ¶ 89]. The application for this award, signed by Defendant Nadler, runs over 600 pages and contains detailed descriptions of proposed projects and related budgets outlining the expenditures of over $106 million, and outlines the projects' specific budgets and proposed projects. [*Id.* at ¶ 90]. In response to the application, NIH awarded Harvard Catalyst five years of grants under FAIN UL1TR001102 starting in September 2013. [*Id.* at ¶ 91]. As with the earlier mentioned grant, NIH issued a NoA for that year's budget allocation bearing a grant number UL1TR001102, followed by a sequential number reflecting which year the budget represented, i.e., in 2013, Defendants were awarded grant number UL1TR001102-01. [*Id.* at ¶ 91].

The NoAs contained similar terms and conditions as described in the previous grant. [*Id.* at ¶¶ 92–93].

Relator alleges that, as with the 2018–2023 grant cycle, Defendants proposed grant funds for multiple aims that were never completed or even attempted. [*Id.* at ¶ 94]. For example, Dr. Nadler proposed to expand funding on the Harvard Catalyst "Promoter Launch Pad" and stated that the launch pad was anticipated to be fully functional by 2014 and would be released as open-source software, but it was neither developed nor released. [*Id.* at ¶ 95]. Additionally, in the 2013–2018 grant application, Dr. Nadler stated that Harvard Catalyst would develop a platform called "Locator" which was never developed. [*Id.* at ¶ 96]. In its 2018–2023 grant application, the "Locator" was also presented as a new idea—the HC IRP platform—that was also never built. [*Id.* at ¶ 97]. Dr. Nadler also obtained funding to develop informatics platforms called Regulatory Checklist Wizard, (Core 3, Clinical and Translational Resources and Services), intended to simplify regulatory compliance, and Personal Path, (Core 4, Education, Training and Career Development Program, Specific Aim 4), which would have allowed investigators to tailor their educational curriculum based on personal criteria. [*Id.* at ¶ 98]. Neither of these platforms were built. [*Id.*].

### 3.     CTSA Hub Grant 2023–2030 (the "2023 Grant")

At the time of the complaint, Harvard Catalyst had filed a seven-year CTSA grant application in response to a Notice of Funding Opportunity PAR-15-304, with a total budget of $76 million. [*Id.* at ¶ 99]. Relator alleges that Defendants had already begun to stray from the specific aims of the grant without seeking prior approval. [*Id.*]. In August 2023, Dr. Nadler commented that during this grant cycle, he would follow NIH rules and comport his project with the approved scope and aims outlined in the approved application. [*Id.* at ¶ 100]. However, Relator

13

alleges that Dr. Nadler began to deviate significantly from the approved aims of the 2023 CTSA Grant without seeking prior approval from NIH. [*Id.* at ¶ 101].

For example, the approved grant application includes descriptions of two research projects in Element E: Clinical and Translational Science Research Program, with two specific aims. [*Id.* at ¶ 102]. But within months of the grant having been approved and funded, Dr. Nadler decided not to perform this work and instead began a series of brainstorming exercises with Dr. Eva Guinan, Dr. Nadler's wife and co-lead on Element E, to develop a completely new project. [*Id.* at ¶ 103]. During this period, Diane Keogh, Harvard Catalyst's senior director for informatics and a direct report to the center's CIO, stated that the newly proposed research is no longer an informatics project at all. [*Id.*]. Dr. Nadler was reminded that any changes to the aims of the grant required prior approval, but this advice was dismissed. [*Id.*]. Relator further alleges that Dr. Guinan spoke with Lucy Kolessin, Harvard Catalyst's senior director of finance and operations, seeking to change the proposed project. [*Id.*]. Ms. Kolessin informed Dr. Guinan that she was required to perform the project that NIH had funded. [*Id.*]. Relator alleges that it remains unclear whether Defendants will do so. [*Id.*].

Relator alleges that Dr. Nadler is attempting to leverage previously approved and funded but incomplete projects to secure additional funding during this 2023 grant cycle. [*Id.* at ¶ 104]. For example, in December 2023, Relator was on a call between Dr. Nadler and the NIH program officer in charge of working with Harvard Catalyst, and Dr. Nadler inquired as to NIH's interest in awarding an RC2 grant for an informatics platform that would provide access to educational and training resources. [*Id.*]. This is the same functionality Defendants induced NIH to pay for the previous grant cycle under the name Integrated Training Platform, which was not developed. [*Id.*].

14

Plaintiffs allege that the foregoing examples are merely a selection of representative examples of Defendants' alleged fraud. [*Id.* at ¶ 105].

### III.    PROCEDURAL HISTORY

Plaintiff and Relator initiated this action on March 18, 2024. [Doc. No. 2]. Plaintiff and Relator bring the following causes of action: Count I for violations of the FCA – False Claims, 31 U.S.C. § 3729(a)(1)(A); Count II for violations of the FCA – False Records or Statements, 31 U.S.C. § 3729(a)(1)(B), and; Count III for violations of the FCA – Reverse False Claims, 31 U.S.C. § 3729(a)(1)(G). Defendants filed their Motion to Dismiss on November 25, 2025. [Doc. No. 38]. Plaintiff-Relator filed his Opposition on December 23, 2025. [Doc. No. 44]. Defendants filed their Reply on January 13, 2026. [Doc. No. 45]. A hearing on the Motion was held on June 18, 2026. [Doc. No. 50].

### IV.    LEGAL STANDARD

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff, the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (citation omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

Claims for relief under the FCA must also satisfy the heightened pleading standards of Rule 9(b). *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir.

2004) (holding that "Rule 9(b) applies to claims under the FCA"), *abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "In such cases, the pleader usually is expected to specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004).

## V.    ANALYSIS

### A.    Claim For Payment

Defendants first move to dismiss Counts I and II of Relator's complaint because Relator does not allege the submission of any claim to the government for payment. "[L]iability under the False Claims Act requires a false claim." *Karvelas*, 360 F.3d at 232. The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Id.* at 225 (citing *United States v. Rivera,* 55 F.3d 703, 709 (1st Cir.1995)). "Therefore, a defendant violates the FCA only when he or she has presented to the government a false or fraudulent claim, defined as 'any request or demand ... for money or property' where the government provides or will reimburse any part of the money or property requested." *Id.* (citing 31 U.S.C. § 3729(c)). "[T]he defendant's presentation of false or fraudulent claims to the government is a central element of every False Claims Act case." *Id.* at 232.

"Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b). However, such pleadings invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action." *Id.* "As applied

16

to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity—specifying the 'time, place, and content' of the alleged false or fraudulent representations, means that a relator must provide details that identify particular false claims for payment that were submitted to the government." *Id.*

Here, "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity." *Id.* at 233. "These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint," but "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.* (citation omitted) (dismissing complaint where it did "not specify the individuals who filed these claims, the dates on which any such claims were filed, the nature and content of any documents submitted, or the amount claimed from the government based on" the alleged fraudulent activity).

Defendants argue that Relator's complaint contains no allegations of a claim for payment, and that the allegations "do not come close to pleading how Harvard Catalyst requested payment from the government, when it did so, who made the requests, or in what amounts." [Doc. No. 39 at 12]. Defendants also argue that the NoAs are not grant applications and are not submissions of a claim for payment. [*Id.*]. Specifically, NoAs are simply a notice that an award has been made and funds may be requested, but do not constitute a claim or a "demand" for payment. [*Id.*]. Defendants further argue that because a grant application, if approved, "simply results in a NoA," it is also not a claim for payment. [*Id.*].

17

Defendants do not cite any authority for their proposition that grant applications or the progress reports[1] are not claims for payment simply because an approved grant application results in an NoA. *See U.S. ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 96 (1st Cir. 2012) (denying cross-motions for summary judgment regarding FCA action where grant applications submitted to an institute within the NIH formed the basis of the false claim for payment). "The paradigmatic example of a false claim under the FCA is a false invoice or bill for goods or services . . . the term, however, applies more generally to other demands for government funds." *United States v. Rivera*, 55 F.3d at 709. Additionally, the FCA "reaches beyond 'claims' which might be *legally enforced,* to all fraudulent ***attempts*** to cause the Government to pay out sums of money." *Id.* at 711 (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)) (emphasis added). Here, the Complaint contains numerous detailed allegations demonstrating Defendants' attempts to induce the Government to pay out funds to help Harvard Catalyst achieve its stated goals.

Additionally, the allegations pertaining to each request for payment are pled with particularity. The Complaint outlines three grant applications and specifies who filed those applications, the content of those applications, and the amount of money sought from the

---

[1] At the hearing, there was extensive argument on whether *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674 (E.D. Pa. 2009) supports Defendants' position that the progress reports are not claims for payment. In *Bauchwitz*, the court explicitly considered the question of "whether the submission of a progress report is a claim or demand for payment under the FCA." *Id.* at 689. The court held that "because approval of a progress report is a prerequisite to the release of funds for a subsequent budget period, a progress report is a claim or demand for payment under the FCA." *Id.* The court next examined "whether the progress reports contained false statements. If they did, they would constitute separate false claims under the FCA." *Id.* In *Bauchwitz*, Defendants agreed that "each progress report constitutes a separate claim or demand for payment from the government," especially where plaintiff admitted that "each progress report contains no express false statement." *Id.* at 690. That is very different from the case here, where Relator alleges that the applications and the progress reports contained false statements. Even though in *Bauchwitz* the court ultimately found that the progress reports "do not constitute false claims," the court explicitly held that progress reports do constitute claims for payment, and, if false, can constitute false claims for the purposes of the FCA. As such, Defendants' reliance on *Bauchwitz* for their argument that there is no alleged claim for payment here is misplaced. Additionally, I find unpersuasive Defendants' arguments that Relator needs to identify a drawdown request to identify a claim for payment. No cases stand for this proposition.

18

government. For instance, the Complaint identifies that Defendant Nadler submitted and signed each grant application, [Doc. No. 1 at ¶¶ 68, 90, 99], the amount of funding requested in each application, [*id.*], and the projects outlined in the grant application for which Defendants intended to use any money paid by the Government, [*id.* at ¶¶ 74–75, 78, 81, 82, 95–98, 102]. "The exact date, number, or value of any single specific claim are . . . not essential to provide notice of which claims are at issue, or to link [Defendants'] allegedly fraudulent conduct to a claim for payment." *United States ex rel. Longacre v. AB Home Health Care, LLC*, No. 2:16-cv-00279, 2017 WL 11698482, at *4 (D. Me. Nov. 9, 2017). Unlike *Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*, 842 F.3d 125, 131 (1st Cir. 2016), where the court dismissed a complaint that did not contain any allegations of "who submitted false claims to the government, how many false claims were submitted to the government, or how the Defendants' actions resulted in the submission of false claims," such allegations are present here. As such, I find that the Complaint sufficiently pleads a claim for payment required under the FCA.

### B.    Falsity

Next, Defendants argue that Counts I and II must be dismissed because Relator fails to plead falsity with particularity. Specifically, Defendants argue that (1) Relator's allegations of falsity are conclusory and unsupported by well-pled facts, (2) Relator's few specific allegations are implausible given the NIH's oversight of the grant arrangement, and (3) Relator's allegations of falsity are contradicted by annual reports detailing the work performed by Defendants. I address each of these arguments in turn.

#### 1.  Sufficiency Of Falsity Allegations

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. This standard means that a complaint must specify

19

the time, place, and content of an alleged false representation." *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009) (citations omitted). "Conclusory allegations . . . are not sufficient to satisfy Rule 9(b)." *Id.* (citations omitted). "The rule may be satisfied, however, where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA." *Id.* (citations omitted). Furthermore, the First Circuit "allows some flexibility in construing the fraud allegations of FCA complaints." *Id.* at 46.

To support their argument that falsity is not pled with sufficient particularity, Defendants point to Relator's allegations that, "[o]f the 56 aims identified in the application . . . the Center failed to complete 41 aims" and that of these 41 aims, "Defendants did not conduct any work on 21 of them." [Doc. No. 1 at ¶ 73]. Defendants argue that Relator does not identify the 41 aims that Harvard Catalyst failed to meet or the 21 aims for which no work was done. Additionally, Defendants argue that Relator's allegations that the annual and final reports "falsely stated that they had complied with the terms and conditions of the award," without specifying which terms and conditions were falsely stated, are conclusory. [*Id.* at ¶¶ 4, 31, 46, 64].

Defendants' focus on these summary paragraphs in Relator's complaint ignores the other allegations that specify the relevant terms and conditions, provide examples of aims outlined in the grant applications, and identify which projects were not completed despite representations that the funding would be used toward completing those projects. *See* [*Id.* at ¶¶ 65–109]. Additionally, Defendants' argument that Relator does not have personal knowledge of what platforms were or were not developed before Relator joined Harvard Catalyst in 2018 is unconvincing. Relator alleges that he reports directly to Defendant Nadler and is responsible for Harvard Catalyst's operations, and that he became aware of instances in which Dr. Nadler refused to comply with the approved budget and applications. *See* [*Id.* at ¶¶ 60–64]. Construing the facts in the light most

favorable to Relator, it is not implausible that Relator would have come to learn about past instances of the alleged misconduct prior to Relator's tenure.

Defendants also argue that Relator's allegations pertaining to the 2023 Grant are insufficient because the Complaint alleges that "[it] remains unclear whether Defendants" will comply with the conditions of the grant application. [*Id.* at ¶ 103]. However, the Complaint also alleges that since the 2023 Grant was approved, Relator is aware that Dr. Nadler has decided "not to perform this work" and has instead "began a series of brainstorming exercises with Dr. Eva Guinan . . . to develop a completely new project." [*Id.*]. Relator then alleged that Harvard Catalyst's senior director of finance and operations instructed Dr. Guinan that she is required to perform the project that NIH had funded. [*Id.*]. Relator's allegation that "it remains unclear whether Defendants will do so" does not make the claim unripe, given his allegations that Dr. Nadler is currently deviating from the conditions of the grant and that he is leveraging previously approved and funded but uncompleted projects to secure additional funding in the 2023 grant cycle. [*Id.* at ¶ 104]. As such, I disagree with Defendants that the falsity allegations are conclusory and not well-pled.

### 2.    Plausibility Of Falsity Allegations

Second, Defendants argue that Relator's allegations of fraud are improbable given that the awards in question are issued as a cooperative agreement in which the NIH has a substantial involvement with the performance of the activities underlying the award. [Doc. No. 39 at 15]. Because the NIH has such significant involvement in the implementation of the awards, Defendants argue that the court should "be skeptical" that the NIH's grant officer "somehow missed that two-thirds of the work contemplated was never done." [*Id.*]. Additionally, Defendants argue that NIH could easily understand what work was done or not done by simply reading the

21

annual reports outlining what work was accomplished and could consider that information when deciding to renew those grants year after year. [*Id.* at 16].

These arguments do not render Relator's allegations implausible. Relator alleges that Defendants made false or misleading statements to the NIH regarding what work they were performing. The very purpose of those fraudulent statements is to keep NIH in the dark such that NIH is unable to discover the truth despite its substantial involvement in the administration of the grant.

Finally, Defendants argue that the annual reports themselves negate any inference that Harvard Catalyst failed to do its proposed work. In support, Defendants ask this court to take judicial notice of the grant applications and annual reports to demonstrate that Harvard Catalyst disclosed work it had done on the proposed aims in the grant application. [Doc. No. 39 at 17–20]. Defendants' memorandum contains a list of the individual aims outlined in the Complaint that Relator alleges were not completed and compares it to statements in the annual reports that Defendants argue demonstrate that the work was in fact completed.

In asking this court to compare Relator's allegations with the annual reports submitted as exhibits, Defendants point to *Schatz v. Republican State Leadership Comm.*, for the authority that "documents may trump the complaint's allegations if a conflict exists, *e.g.,* where a defendant has excised an isolated statement from a document and imported it into the complaint." 669 F.3d 50, 55 n.3, 55–56 (1st Cir. 2012) (citation omitted). But *Schatz* is inapposite. There, the plaintiff sued defendants for defamation, incorporating in his complaint two newspaper articles that allegedly contradicted the defamatory statements and demonstrated that defendants acted with "actual malice" in making the false statements. *Id.* at 55. The proposition for which *Schatz* stands is inapplicable here because the allegations are that defendants concealed from the NIH their

22

intentions in obtaining the funds. Accepting Relator's allegations as true, it would be logical for Defendants to state, in their annual reports, that they have substantially complied with the funding requirements. Because the allegations are that Defendants used crafty grantsmanship to obscure their true usage of the funds, it would be a futile effort for this court to sift through hundreds of pages of reports to compare them to the allegations here. It is well-settled that "a district court may not weigh evidence in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Gonzalez-Camacho v. Banco Popular de Puerto Rico*, 318 F. Supp. 3d 461, 472 (D.P.R. 2018) (cleaned up). As Defendants' exhibits demonstrate, this is an issue that is too fact-intensive and is inappropriate for disposition on a motion to dismiss. I find that Relator has sufficiently pled falsity with sufficient particularity.

### C.    Materiality

Defendants also move to dismiss Counts I and II of Relator's FCA claims for failure to state materiality. The First Circuit has "long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material." *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010). The Supreme Court has clarified that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016) ("*Escobar I*"). "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 192–193 (Citation omitted). The "materiality standard is demanding" because the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194. The Court explained that:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual

23

requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

\*\*\*

[W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 194–195.

In sum, "[a] misrepresentation about compliance with statutory, regulatory or contractual requirements is material only if: 1) it likely would be important to a reasonable recipient in 'determining his choice of action' or 2) if the defendant knew it would actually be important to the choice of action of a particular recipient." *United States v. Town of Hingham*, 683 F. Supp. 3d 81, 89 (D. Mass. 2023), *aff'd sub nom. United States ex rel. Zotos v. Town of Hingham*, 98 F.4th 339 (1st Cir. 2024) (citing *Escobar I*, 579 U.S. at 193). "The First Circuit has held that the touchstone of that inquiry is whether the misrepresentation 'is sufficiently important to influence the behavior of the recipient.'" *Id.* (citing *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) ("*Escobar II*"))

Defendants argue that in this case, the funding awards in question provide Harvard Catalyst with significant discretion in how to complete the work described in the grant applications, and the grant officer is actively involved in the progress of these projects. [Doc. No. 39 at 21–22]. As

such, Defendants argue that the government's decision to continue paying despite its knowledge of alleged non-performance "is very strong evidence that those requirements are not material." *Escobar I*, 579 U.S. at 195.

"Courts assess the materiality of such a misrepresentation pursuant to a holistic analysis that includes three primary factors, none of which is dispositive: 1) whether the government expressly identified compliance with particular requirements as a condition of payment, 2) whether the government nevertheless paid a claim despite knowing that those requirements were violated and 3) whether the noncompliance in question is 'minor and insubstantial' or goes to 'the very essence of the bargain.'" *Town of Hingham*, 683 F. Supp. 3d at 89 (citing *Escobar I*, 579 U.S. at 193–195, 193 n.5). Defendants do not dispute that compliance with the requirements of the grant award are a condition of payment, and do not argue that the allegedly incomplete projects for which the funds were awarded were "minor or insubstantial" to the award. Rather, Defendants primarily focus on the fact that the government continued to pay the claim despite knowing that those requirements were violated. But there is no evidence or plausible argument that the government knew that Harvard Catalyst was not completing certain projects but continued to pay them anyways. Indeed, Defendants argue that "the only plausible conclusion is that NIH repeatedly decided to renew Harvard Catalyst's funding each year because any deviation from the tasks described in its grant application were not material to NIH's funding decisions as a matter of law." [Doc. No. 39 at 24]. This argument is in and of itself conclusory.

Following the Supreme Court's holding in *Escobar I*, the First Circuit applied the Court's guidance in assessing materiality and found that, while the government's continued payment of a particular claim despite knowledge that certain requirements could constitute "strong evidence that those requirements are not material," it was not "dispositive" evidence. *Escobar II*, 842 F.3d at

110–11 (citing *Escobar I*, 579 U.S. at 195). There, the First Circuit held that the FCA complaint could survive a motion to dismiss because Relators alleged that "regulatory compliance was a condition of payment," established that compliance with the relevant requirements were central to the payment, and even though the government continued to pay, there was "no evidence in the record" that it continued to pay "despite knowing of the violations." *Id.* The First Circuit further noted that while this "information may come to light during discovery, at this time Relators have stated a claim," especially when applying the "Supreme Court's holistic approach to determining materiality." *Id.* at 112. Similarly, here, Relator has alleged that Harvard Catalyst's award is conditioned upon completion of the aims outlined in the grant application, [*see, e.g.*, Doc. No. 1 at ¶¶ 27–29], that a "fundamental" requirement of any NIH grant is to conduct the project in accordance with the approved application and terms and conditions of the award, [*see, e.g.*, *id.* at ¶ 33], and that Defendants promised to use the funds to complete certain projects but did not do so, [*see, e.g.*, *id.* at ¶ 73]. As such, Relator has sufficiently pled materiality.

At this stage, for all the reasons explained above, I find that the complaint is sufficient to survive a motion to dismiss. Defendants' Motion is <u>DENIED</u> as to Counts I and II.

### D.    <u>Reverse False Claim</u>

Finally, Defendants move to dismiss Count III of Relator's Complaint for reverse false claims. The FCA creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "[R]everse-FCA liability cannot be premised solely on the same conduct that gives rise to traditional presentment or false-statement claims." *United States ex rel. Stonebrook v.*

*Merck KGaA, Darmstadt, Germany*, No. 21-cv-10866, 2024 WL 1142702, at \*11 (D. Mass. Mar. 15, 2024) (citation omitted). "Where a complaint makes no mention of any financial obligation that the defendants owed to the government, and does not specifically reference any false records or statements used to decrease such an obligation, a court should dismiss the reverse false claim." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) (citation omitted).

Relator's reverse false claims theory is premised on the allegation that "The Government, unaware of Defendants' violation of this provision, has not made demand for or collected the years of overpayments due from the Defendants." [Doc. No. 1 at ¶ 125]. As such, Relator argues that the NIH regulations and policies create an independent obligation to *repay* wrongfully retained funds to the NIH, and this type of obligation would arise if the requisite scienter requirement was not met to establish a violation of 31 U.S.C. § 3729(a)(1)(A) or (B). Defendants argue that Relator has not identified an independent duty to pay money to the government that is separate from the underlying claims. I agree.

An obligation to repay funds wrongfully withheld as a result of the original FCA violation cannot also constitute the basis for Relator's reverse false claims theory. Reverse false claims allegations that "essentially boil down to various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled [] are not an adequate basis on which to allege a reverse false claim." *United States ex rel. Gelbman v. City of New York*, 2018 WL 4761575, at \*8 (S.D.N.Y. Sept. 30, 2018) *aff'd*, 790 F. App'x 244 (2d Cir. 2019) (summary order). "Concluding otherwise would mean that any time a defendant violated subsections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate subsection (G) if it failed to repay to the Government the fraudulently-obtained payments." *United States ex rel. Foreman*, 19 F.4th at 120 (citation omitted).

Accordingly, Defendants' Motion to Dismiss as to Count III is <u>GRANTED</u> and Relator's reverse false claim is dismissed.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, [Doc. No. 38], is <u>DENIED</u> as to Counts I and II but <u>GRANTED</u> as to Count III. Defendants shall file an Answer to the remaining counts in the Complaint within fourteen days.


SO ORDERED.

<u>/s/ Myong J. Joun</u>
United States District Judge
